1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFERY RAY GOLDEN, | )   Case No.: 1:12-cv-00573-SKO |
| | ) |
| Plaintiff, | )   **ORDER REGARDING PLAINTIFF'S** |
| | )   **COMPLAINT** |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

## INTRODUCTION

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").  42 U.S.C. §§ 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

_____

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 9, 10.)

**FACTUAL BACKGROUND**

Plaintiff was born on January 4, 1969; he is a high school graduate with some college and vocational training. (Administrative Record ("AR") 13, 22, 42-43.) Plaintiff has past relevant work experience as a truck driver, lawn care specialist, security guard, deli worker, customer service agent, and has worked in construction as general laborer. (AR 13, 59, 199.) Plaintiff last worked in January 2008 and since then claims to have become unable to work because of his bipolar disorder and high blood pressure. (AR 177.)

**A.      Relevant Medical Evidence**

Medical records from the Merced County Department of Mental Health ("Merced Mental Health") between February 2006 and January 2007, show that Plaintiff obtained some treatment for bipolar I disorder. (AR 246-53.) A January 2007 Merced Mental Health "discharge summary" shows that from February 2006 to January 2007, Plaintiff attended two medical and two counseling appointments. In January 2007, it was noted that Plaintiff's last prescription for medication was dated August 22, 2006, for Remeron and Depakote with two refills, and that Plaintiff reported poor compliance with his medication. (AR 246.) The discharge summary also indicated that Plaintiff reported the following problems and symptoms: excessive spending, agitation, hypersexuality, poor concentration, poor memory, poor self-image, poor impulse control, poor judgment, expansive mood, and poor hygiene. (AR 246.) The discharging physician also noted that Plaintiff had an unknown current Global Assessment of Functioning ("GAF"), but his GAF score over the past year was 55.[2] (AR 246.) Plaintiff was prescribed Atenenon and hydrochlorizide prior to discharge. (AR 248.)

In June 2008, Plaintiff returned to Merced Mental Health for treatment. (AR 251.) Plaintiff reported being off his medication for the prior three months, was presently unemployed, had no major problems at home or in the community, and was "fairly stable." (AR 251, 257.) He had stopped coming to Merced Mental Health in the previous year because he felt better, but reported

---

[2] The GAF scale is an assessment tool to rate psychological, social, and occupational functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. 2000). Scores between 51 and 60 represent moderate difficulty in social, occupational, or school functioning.

he was depressed because he felt as though he could not function. (AR 251.)   He also reported that his medication had caused him to gain weight. (AR 251.)  Manolito V. Castillo, M.D., noted that Plaintiff's appearance was "normal," he had no hallucinations or delusions, and his judgment was intact. (AR 252.)  Plaintiff's mental status examination showed "good grooming and hygiene," no thought disturbances, his mood was depressed and irritable, but he had no suicidal or homicidal ideation and reported no psychotic symptoms. His insight and judgment were intact, and Dr. Castillo noted Plaintiff had average intellect.  (AR 257.)  He was assigned a GAF score of 65 (AR 257), which corresponds to some difficulty in social, occupational, or school functioning but "generally functioning pretty well." *See* DSM-IV, 34.

On July 14, 2008, Plaintiff was again seen at Merced Mental Health. (AR 259.)  His response to medication was deemed "fair," and his mood was mildly improved. (AR 259.) Plaintiff reported that he was tolerating his medication, but he was still experiencing severe mood swings and irritability.  (AR 259.)  His prescription for Depakote was increased, and his prescription for Remeron was continued. (AR 259.) He was to follow-up with additional treatment in three weeks. (AR 259.)

In August 2008, state agency medical consultant, H. Bilala, M.D., reviewed Plaintiff's medical records and completed a mental residual functional capacity assessment form (AR 266-68), and a psychiatric review technique form (AR 269-79).  Dr. Bilala determined that Plaintiff was "not significantly limited" in his ability to (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (8) interact appropriately with the general public; (9) ask simple questions or request assistance; (10) accept instructions and respond appropriately to criticism from supervisors; (11) get along with coworkers or peers without distracting them or exhibiting behavior extremes;

(12) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (13) respond appropriately to changes in the work setting; (14) be aware of normal hazards and take appropriate precautions; and (15) set realistic goals or make plans independently of others. (AR 266-67.) He found Plaintiff "moderately limited" in the ability to understand, remember, and carry out detailed instructions. (AR 266.) Dr. Biala also noted that Plaintiff had the cognition for simple tasks; Plaintiff's concentration, persistence, and pace were sufficient for two-hour intervals in an eight-hour day and forty-hour workweek; Plaintiff was socially available for "superficial contacts"; and he could adapt to workplace stressors. (AR 268.)

In completing the psychiatric review technique form, Dr. Biala noted that Plaintiff had an affective disorder that mildly limits his activities of daily living and social functioning. (AR 277.) It was noted that Plaintiff would have moderate difficulties in maintaining concentration, persistence, or pace. (AR 277.) Dr. Biala indicated that Plaintiff had responded to medication in the past, and was presently back on medication with "mild improvement," but his Depakote was to be increased. (AR 279.) Dr. Biala projected that, through June 2009, Plaintiff would be able to complete simple, repetitive tasks. (AR 279.)

On September 3, 2008, Plaintiff was seen by Dr. Castillo at Merced Mental Health. (AR 305.) Plaintiff reported that he had not taken the prescribed increased dosage of Depakote and was reminded to do so. (AR 305.) Plaintiff's response to medication was noted to be "good."

On September 26, 2008, Plaintiff was voluntarily admitted to the Marie Green Psychiatric Center ("Marie Green") as he was experiencing severe hallucinations. (AR 294.) Plaintiff's discharge summary was completed by Dr. Castillo who indicated that he knew Plaintiff because he had been treating Plaintiff for bipolar disorder at the Merced Adult Outpatient Clinic. (AR 296.) Plaintiff had been experiencing auditory hallucinations, and his Abilify prescription was increased to treat the hallucinations; however, the medication was not effective. Instead, the hallucinations had intensified and caused him severe headaches, anxiety, and agitation prompting his wife to bring him to emergency services, leading to his hospitalization. (AR 294.) During the course of his hospitalization at Marie Green, his prescription for Abilify was discontinued and Geodon was

prescribed in its place.  Plaintiff was also prescribed Thorazine for intense hallucinations.  Plaintiff complained of weight gain on Depakote, and thus was prescribed Topamax to decrease his appetite.  Plaintiff tolerated the medications, and felt greatly improved and ready to go home at the time of discharge.  (AR 295.)  His laboratory work was negative for any illicit substances.  (AR 295.)  At the time of discharge, Plaintiff was no longer experiencing auditory hallucinations and mood changes, he was tolerating his medications without any untoward side effects, and he denied having any suicidal or homicidal ideations, delusions, or hallucinations.  Accordingly, Plaintiff was discharged on September 28, 2008, and was referred to Merced Adult Outpatient Clinic for a mental health follow-up with Dr. Castillo on October 1, 2008.  (AR 296.)

Plaintiff followed-up with Dr. Castillo on October 1, 2008, who noted that Plaintiff was responding better with his current medication, he had no suicidal or homicidal ideation, and he was directed to continue his medication.  (AR 306.)  On October 22, 2008, Plaintiff was seen by Dr. Castillo for follow-up care; Plaintiff reported tolerating his medication, and his response to the medication was noted to be good.  (AR 307.)  On November 19, 2008, Plaintiff was again seen by Dr. Castillo for follow-up care, and reported that his medications were helping him "optimally," he did not feel "as down as before," and he was doing well.  (AR 308.)

Plaintiff was seen at Merced Mental Health on January 12, 2009.  (AR 352.)  He stated his medication regime was working well, he was medication compliant, and he was "doing better than a few weeks ago."  (AR 352.)  The treatment plan required Plaintiff to keep all scheduled appointments, remain medication complaint, and follow-up in four weeks.  (AR 352.)  On February 5, 2009, Plaintiff was seen by Dr. Castillo at Merced Mental Health and reported hypomanic symptoms and that he was sleeping less yet remained energized in the morning.  (AR 351.)  Plaintiff was also making "silly" remarks and gestures at home.  (AR 351.)  Plaintiff's response to medication was marked as "good," and his Depakote dosage was increased.  (AR 351.)  On March 30, 2009, Plaintiff again saw Dr. Castillo and reported that he was medication compliant, but his wife indicated that his mood was worsening, and he had been under-reporting his symptoms to Dr. Castillo.  (AR 350.)  His auditory hallucinations were intensifying, and his wife had asked him to move out

1    if the symptoms were not controlled.  (AR 350.)  Dr. Castillo discontinued the prescription for
2    Geodon, and prescribed Zyprexa.  (AR 350.)

3          Plaintiff was seen by Dr. Castillo at Merced Mental Health on April 15, 2009.  (AR 349.)
4    It was noted that Plaintiff's manic symptoms were diminishing, but he remained hypomanic.
5    Plaintiff reported medication compliance and that his sleep had improved.  (AR 349.)  Plaintiff's
6    medication was adjusted, and he was to follow-up for treatment in two weeks.  (AR 349.)

7          On April 21, 2009, Plaintiff was provided emergency care at Mercy Medical Center.
8    (AR 385-86.)  Plaintiff reported acute chest pain, but chest x-rays were negative for heart failure,
9    pneumonia, or pneumothorax.  (AR 386.)

10         Plaintiff received follow-up treatment on April 29, 2009, and reported feeling "tormented"
11   because his wife wanted him to stop his medications.  (AR 348.)  Plaintiff was unsure if the
12   medication was fully working, but  despite his medication concerns, he reported being medication
13   compliant. (AR 348.) He noted he was over-sleeping, which Dr. Castillo attributed to the Zyprexa.
14   Plaintiff reported showing no anger or irritability at home, unlike before.  He was noted to be
15   "immaculately dressed."  (AR 348.)  His medication was adjusted, and Dr. Castillo indicated he
16   should return for follow-up treatment in two weeks.  (AR 348.)

17         On May 6, 2009, Plaintiff was admitted again to Marie Green reporting suicidal thoughts,
18   and intense hallucinations, and was treated by Dr. Castillo. (AR 323.) Dr. Castillo noted that during
19   the previous weeks, changes in Plaintiff's medications had been made as his hallucinations and mood
20   swings were intensifying.  (AR 323.)  Dr. Castillo indicated that Plaintiff had been compliant with
21   his medications, but his hallucinations continued to persist, especially in the three to five days prior
22   to hospitalization.  (AR 323.)  Plaintiff reported experiencing severe headaches due to constant
23   messages he was hearing, rendering him unable to sleep.  (AR 323.)  The voices were also telling
24   him to kill himself.  (AR 323.)  His family decided to take him back to Marie Green.  (AR 323.)

25         Dr. Castillo noted that Plaintiff's wife stated that he had not been able to tolerate higher
26   dosages of Depakote and that he seemed to do better on a lower dose.  (AR 324.)  Dr. Castillo
27   lowered Plaintiff's prescription for Depakote, and noted that Plaintiff tolerated the medication
28   adjustments.  Dr. Castillo also noted that Plaintiff's hallucinations diminished, his mood was "far

more stable," and he was discharged on May 11, 2009.  The discharge recommendations included a referral to Merced Mental Health for follow-up care, to see a medical doctor for health problems, and to obtain a computed tomography ("CT") scan.  His prognosis was considered "good" so long as Plaintiff remained compliant with medication and pursued follow-up care.  (AR 325.)

On May 13, 2009, Plaintiff was seen by Dr. Castillo for follow-up care, and it was noted that Loxitane was helping to manage Plaintiff's auditory hallucinations.  (AR 347.)  Plaintiff was to follow-up with treatment in one month.  (AR 347.)  On May 29, 2009, Plaintiff was seen at Merced Mental Health for a therapy session, and he stated that he felt the best he had in many months and things were going well.  (AR 346.)

On June 2, 2009, Plaintiff failed to keep a scheduled appointment for therapy.  (AR 345.) On June 3, 2009, Plaintiff was seen at Mercy Medical Center with complaints of feeling overtired and over-medicated.  (AR 381.)  Plaintiff's wife reported that Plaintiff was not able to complete his thoughts, his speech was slurred, and he was mimicking her.  (AR 381.)  A CT scan was ordered, but it was negative for intracranial abnormality.  (AR 382.)  The examining physician noted an impression of acute hypersomnolence secondary to acute electrolyte abnormality/hypokalemia. (AR 382.)  Although Plaintiff reportedly had taken his prescription medication that morning, a drug screen was negative even for benzodiazepines.  (AR 378, 382.)  Plaintiff was discharged and was instructed to follow-up in the Family Care Clinic in one day.  (AR 382.)

On June 10, 2009, Plaintiff was seen at Merced Mental Health, he reported that his Bell's Palsy had flared up, and he was taken to the hospital where a CT scan was taken.  His response to medication was reported to be good, and he was instructed to follow-up in three weeks.  (AR 343.) On June 22, 2009, and on July 1, 2009, Plaintiff failed to appear for appointments.  (AR 342.)  On July 8, 2009, Merced Mental Health telephoned Plaintiff, due to his failure to appear at his last scheduled appointments.  Plaintiff was unavailable, but his wife reported that his medication compliance was good, and he needed all his medications refilled.  (AR 339.)  On July 31, 2009, Plaintiff appeared for another mental health status examination.  His medication compliance was noted to be good, but he had stopped taking his prescription for Topamax because he was experiencing tremors in his hand, which he attributed to the Topamax.  (AR 338.)  Plaintiff's

1   medications were adjusted, and he was to report for follow-up care in one month. (AR. 338.)

2   Plaintiff was seen for follow-up treatment on August 28, 2009. (AR 337.) Plaintiff reported feeling

3   moody and that he had stopped taking Topamax; as a result, his tremors had stopped. (AR 337.)

4   It was noted that Plaintiff had missed a therapy appointment. (AR 337.) Plaintiff had gained weight,

5   possibly because of his discontinuation of the Topamax. (AR 337.) Dr. Castillo reported that he did

6   not believe Topamax contributed to Plaintiff's tremors but that Loxitane was the cause instead.

7   (AR 337.)  Plaintiff described his mood as mildly unstable, but denied experiencing suicidal or

8   homicidal thoughts, and he experienced no active hallucinations or delusions. (AR 337.) Plaintiff's

9   medications were adjusted, and he was instructed to follow-up for care in two weeks. (AR 337.)

10      On September 11, 2009, Plaintiff presented for a follow-up appointment where Dr. Castillo

11  noted that Plaintiff was still experiencing mood changes, alternating episodes of feeling "moody and

12  mop[e]y," but did not report any hallucinations. (AR 336.) Plaintiff had also decided not to take his

13  prescribed Abilify, fearing that it might induce hallucinations. (AR 336.) Dr. Castillo educated him

14  that the likely cause of his hallucinations was that his mania worsened, and not because of the

15  Abilify.  Dr. Castillo advised Plaintiff to retry the Abilify, and take a second dose of Ativan.

16  (AR 336.)  Plaintiff was instructed to seek follow-up care in two weeks. (AR 336.)

17      On September 25, 2009, Dr. Castillo again examined Plaintiff, and noted that Plaintiff's mood

18  was unchanged, and he was still easily irritated. (AR 335.) Dr. Castillo noted that, while Plaintiff's

19  wife believed otherwise, compared to how Plaintiff presented in the past, Plaintiff appeared to be

20  improved. (AR 335.) Plaintiff indicated that Abilify was not helping much. (AR 335.) Dr. Castillo

21  reported that Plaintiff's home environment was destablizing him, which contributed to his mood

22  changes and that medication would not help with that problem.  Dr. Castillo advised Plaintiff to seek

23  treatment with a different psychiatrist, due to the fact that Plaintiff and his wife stated they were

24  dissatisfied with Dr. Castillo.  (AR 335.)  Plaintiff's medications were adjusted, and a change of

25  provider was recommended.  (AR 335.)

26      On November 6, 2009, Plaintiff was seen by Edward Benton, M.D., at Merced Mental

27  Health. (AR 333.) It was noted that his wife was pleased with the current regimen, that Plaintiff had

28  an attorney to appeal his SSI denial, and that Plaintiff saw no chance of returning to work as a truck

driver because of traffic tickets, but he was thinking of going to the junior college. (AR 333.) Plaintiff's medication response was noted to be "okay," and he was instructed to follow-up in three months. (AR 333.)

On January 8, 2010, Plaintiff saw Dr. Benton for follow-up treatment. Plaintiff's response to medication was noted to be "okay." (AR 332.) Plaintiff's medications were adjusted, and he scheduled a follow-up appointment for February 5. (AR 332.)

Plaintiff missed his February 5, 2010, appointment, but rescheduled for February 24, 2010. (AR 329.) On February 24, 2010, Plaintiff's medications were adjusted by Dr. Benton, and Plaintiff was instructed to follow-up in two months. (AR 329.)

On March 22, 2010, Plaintiff's wife reportedly called 911 after Plaintiff splashed candle wax on his face. (AR 476.) Plaintiff explained that he was trying to stop the voices because they were commanding him to overdose on all his medication, and he was fearful that he would respond to the voices if he did not receive any treatment. (AR 476.) Dr. Castillo was notified of the situation, and Plaintiff was voluntarily admitted to CSU.[3] (AR 476.) Plaintiff was assessed a GAF score of 35 (AR 479), which equates to major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV, at 34.

On April 23, 2010, Plaintiff was again seen by Dr. Benton for a follow-up appointment. (AR 328.) Plaintiff continued to complain of auditory hallucinations and wished to try increasing his dosage of Abilify. (AR 328.) Plaintiff reported that Wellbutrin seemed to help for his mood, and he wanted to increase his dosage to maximize the benefit. (AR 328.)

On June 11, 2010, Plaintiff attended a therapy session at Merced Mental Health. (AR 475.) He reported that Dr. Benton referred him to counseling due to persistent dysphoria and that Dr. Benton stated he had done all that he could with medication. (AR 475.) The therapist noted that they would develop a treatment plan during the next session.

On June 17, 2010, Plaintiff attended another therapy session at Merced Mental Health. (AR 474.) He reported that he believed he was headed into "one of his Marie Green" episodes

---

[3] "CSU" was not defined in the medical records.

because of the frequency and intensity of his headaches.  He reported that his usual course of treatment is to go to CSU for 12 to 18 hours to "chill out" and receive a larger dose of Ativan.  (AR 474.)  As a result, he usually avoids admission to Marie Green.  (AR 474.)  He reported that these episodes occurred about every two months, and that the primary symptom during the events is increased intensity of his auditory hallucinations.  (AR 474.)  He also confirmed that he was distracted several times during the therapy session by auditory hallucinations.  (AR 474.)  The treating professional noted that Plaintiff's tracking and processing was sporadically slowed by auditory hallucinations, but his thoughts were otherwise organized and his speech was linear but slow paced.  (AR 474.)  Although he denied suicidal thoughts, he admitted that he sometimes tires of the voices so much that he does entertain suicidal thoughts, but he was generally able to diminish such thoughts by processing them with his wife.  (AR 474.)  He stated that his primary stressor was financial, and they discussed possible financial assistance options.  (AR 474.)  On June 22 and 25, 2010, Plaintiff missed two scheduled appointments at Merced Mental Health.  (AR 472, 473.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 77-98, 100-05.)  On July 22, 2010, ALJ Teresa L. Hoskins Hart held a hearing.  Plaintiff, through the assistance of counsel, and a vocational expert ("VE") provided testimony.  (AR 31-66.)

**1.    Plaintiff's Hearing Testimony**

Plaintiff lives with his wife and their two youngest children, ages 15 and 18.  (AR 41.)  Plaintiff testified that during a typical day he wakes around 7 a.m. and starts doing the things around the house that he can do without too much shaking in his hand.  (AR 41.)  He will take a nap around 10 or 11 a.m. and then get up around 1 or 2 p.m.  (AR 41.)  Plaintiff takes naps up to two times per day that last between three to four hours.  (AR 45.)  He usually tries to help his wife make dinner and help their children with homework, watches some television, and then goes to bed.  (AR 41.)  Plaintiff stated that he is unable to work due to auditory hallucinations, agitation and irritability, mood swings, and physical limitations due to shaking in his hand – e.g., he has a hard time tying his shoes.  (AR 42.)

Plaintiff testified that he hears voices all the time, and he is unable to block them out most of the time. (AR 43.) He takes medication for hallucinations, which does reduce the voices but does not completely eliminate them.  He has informed his treating physician, Dr. Benton, that the medication has not completely stopped the voices, and Dr. Benton keeps progressively increasing his medication dosage. (AR 44.) Plaintiff experiences side effects from his medication, including tiredness, irritability, a facial tick, and hand shaking. (AR 44.) Plaintiff also experiences cyclical depression near the end of each month. (AR 45-46.) This is in contrast with manic episodes he experiences more toward the beginning of each month when he becomes hyper and tries to "do things on a grand scale." (AR 46.) In his manic phases, he spends money "like it's water," which is why his wife takes care of their finances. (AR 47.) His depressive phases last approximately two weeks and during this time Plaintiff experiences irritability, anxiety, aggression, and depression. (AR 47.) During this phase, Plaintiff sits around the house, takes more naps of longer duration, does not get dressed or shower, and his appetite is reduced. (AR 48.) Plaintiff also experiences suicidal thoughts during the depressive phases and has difficulty focusing and concentrating. (AR 50.) Plaintiff stated he was last hospitalized for his bipolar disorder in March 2010 because the voices in his head "got really bad," and he suffered from headaches as well. (AR 50.) At the time, he thought that throwing hot wax on his face would stop the symptoms. (AR 51.) He remained in the hospital for one day, and then he was released. (AR 51.) He was previously hospitalized for crying fits lasting up to two days, as he had become overwhelmed. (AR 51-52.) Plaintiff testified that he had not used alcohol or drugs for 17 years, and he was first diagnosed with bipolar disease in 2001. (AR 52-53.)

## 2.    Third-Party Testimony

Plaintiff's wife, Nancy Golden, also testified. (AR 53.) She stated that Plaintiff had difficulty focusing on tasks and concentrating. (AR 54.) Plaintiff had some brain damage according to a magnetic resonance imaging ("MRI") scan, and things "don't seem to stay in the long-term memory for him." (AR 54.)  When Plaintiff is unmedicated, he is irritable, argumentative, and angry. (AR 54.) When he is medicated, he cannot focus, he shakes, and he cannot handle dishes. (AR 55.) He cycles from a manic phase at the beginning of the month to a depressive phase at the end of the

month. (AR 55.)  During his manic phase, he is too happy, sometimes inappropriately so, and he binges on things like ice cream or candy.  (AR 55.)  As Plaintiff cycles to his depressive phase, he becomes moodier and irritable, he does not respond well to noise in the house, he has to seclude himself, and he shuts down.  (AR 55.)  Even on days during the depressive phase that he is not as down, he still tends to stay very quiet and keeps to himself.  Ms. Golden stated that Plaintiff is not without his medication, and he has regularly taken his medications over the last two years, unless the doctors have changed the prescriptions.  When Plaintiff takes new medication, it takes a few weeks for the medication to take effect.  (AR 57.)

**3.  VE Testimony**

During the course of the hearing, the ALJ posed several hypotheticals to the VE.  The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and prior work experience who has no limitations for unskilled tasks, but is moderately limited in performing, understanding, remembering, and carrying out detailed instructions. (AR 60.) The VE testified that such a person could perform Plaintiff's past work as a laborer, which is light and unskilled.[4]  (AR 61.)

The ALJ posed a second hypothetical person with the same abilities and limitations as in the first hypothetical, but who had an additional limitation to no more than occasional interaction with the general public.  The VE testified that a person limited in that manner could perform Plaintiff's past work as a laborer.  (AR 61.)

In a third hypothetical, the ALJ asked the VE to consider a person who had all the same limitations identified in the second hypothetical, but had an added limitation to no more than occasional interaction with co-workers.  (AR 61.)  The VE testified that such a person would not be able to perform any of Plaintiff's past relevant work, but could perform work as a hand packager, Dictionary of Occupational Titles ("DOT") 920.587-134, a line-service attendant, DOT 912.687-010, or an extractor operator, DOT 581.685-038.  (AR 62-63.)

---

[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).

In a final hypothetical, the ALJ asked the VE to consider a person with the same limitations as that in the third hypothetical, but with the added limitation that the person would be off task ten percent of the work day due to problems maintaining attention and concentration.  (AR 63.)  The VE testified that this combination of limitations foreclosed all work as normally found.  (AR 63.)

### 4.      The ALJ's Decision

On November 18, 2010, the ALJ issued a decision finding Plaintiff not disabled since January 2, 2008, through the date of decision. (AR 13-24.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the application date of January 2, 2008; (2) has the following impairments that are considered "severe" based on the requirements in the Regulations:  bioplar disorder and a history of substance abuse; (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) retains the functional capacity to perform a full range of work at all exertional levels, but with the nonexertional limitations to unskilled work with no more than occasional interaction with the general public and no more than occasional interaction with co-workers; (5) is unable to perform any past relevant work; and (6) can perform jobs that exist in significant numbers in the national economy.  (AR 17-23.)

### 5.      Review of the ALJ's Decision Denied

Plaintiff sought review of this decision before the Appeals Council.  (AR 5-9.)  On February 15, 2012, the Appeals Council denied review.  (AR 1-3.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

## C.      Plaintiff's Complaint

On April 12, 2012, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff argues that the ALJ erred in assessing the medical evidence and failed to state clear and convincing reasons for discrediting Plaintiff's lay testimony.  (Docs. 1, 18.)

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

determine whether the Commissioner applied the proper legal standards and whether substantial

evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d

909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.

Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305

U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the

evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may

not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*,

504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to

engage in any substantial, gainful activity by reason of any medically determinable physical or

mental impairment that can be expected to result in death or that has lasted, or can be expected to

last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

impairments must result from anatomical, physiological, or psychological abnormalities that are

demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

such severity that the claimant is not only unable to do his previous work, but cannot, considering

his age, education, and work experience, engage in any other kind of substantial, gainful work that

exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis

in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the

claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).

If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

or a combination of impairments significantly limiting her from performing basic work activities.

14

1  20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the

2  claimant has a severe impairment or combination of impairments that meets or equals the

3  requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R.

4  §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

5  has sufficient residual functional capacity despite the impairment or various limitations to perform

6  her past work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to

7  the Commissioner to show that the claimant can perform other work that exists in significant

8  numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If a claimant is found to

9  be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.

10  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

11  **DISCUSSION**

12  **A.      The ALJ's Consideration of the Medical Evidence**

13  **1.      The Parties' Arguments**

14          Plaintiff argues that the ALJ improperly assigned great weight to state-agency consultative

15  physician, Dr. Biala, in determining Plaintiff's mental RFC.  Plaintiff maintains that, even to the

16  extent that a state-agency consultative physician's opinion may constitute substantial evidence, Dr.

17  Biala's opinion cannot constitute substantial evidence because it was rendered without review of all

18  the relevant medical evidence.  Specifically, Dr. Biala reviewed Plaintiff's medical record and

19  reached an opinion about Plaintiff's level of mental functioning in August 2008.  However, Plaintiff

20  was subsequently hospitalized in September 2008, May 2009, and March 2010 due to the increasing

21  severity of Plaintiff's mental symptomatology.  As a result, Plaintiff maintains that Dr. Biala's

22  opinion regarding Plaintiff's mental functioning is "stale."  (Doc. 18, 7:15-8:11.)  Plaintiff argues

23  that, in light of Dr. Biala's out-of-date medical opinion, the ALJ should have recontacted Plaintiff's

24  treating psychiatrist before relying on the "stale" opinion of a non-examining physician.  (Doc. 18,

25  8:12-21.)  Plaintiff also asserts that, since additional medical evidence was submitted after Dr. Biala

26  reviewed the records, the ALJ should have utilized the services of a medical expert.  Plaintiff

27  contends that because the ALJ made no effort to recontact the treating source before relying on the

28

opinion of a reviewing physician and failed to utilize a medical expert in light of new medical evidence, the ALJ failed to fully and fairly develop the record.  (Doc. 18, 8:22-9:9.)

The Commissioner argues that Dr. Biala's opinion constitutes substantial evidence because it is consistent with the record as whole.  The medical records establish that when Plaintiff is compliant with his medications, he functions well, and has no limitations greater than those Dr. Biala assessed.  As to Plaintiff's contention that the ALJ was required to recontact Plaintiff's treating psychiatrist, the Commissioner asserts that there are no opinions from a treating source that address Plaintiff's mental limitations, and Plaintiff fails to specify which treating psychiatrist he would have the ALJ recontact.  Further, the ALJ had sufficient information to make a determination as to Plaintiff's disability, and thus the duty to recontact a physician was not triggered.  The Commissioner contends that the ALJ was not required to call upon the services of a medical expert.  Plaintiff cites to SSR 96-6p, which relates to decisions based upon medical equivalence, but Plaintiff failed to provide any analysis regarding medical equivalence beyond a bare assertion.  Here, in finding that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments, the ALJ properly relied on Dr. Biala's expert opinion, which supported the ALJ's decision that Plaintiff did not meet or equal a listing.

### 2.    The ALJ Must Consider All Probative and Significant Medical Evidence and Resolve the Conflicts in the Evidence

The opinion of a non-examining physician may serve as substantial evidence when it is consistent with other independent evidence in the record. *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995); *see also Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it").

Here, Dr. Biala's opinion regarding Plaintiff's mental functioning was provided in August 2008. Dr. Biala indicated that while Plaintiff had been diagnosed with bipolar disorder, his cognition was intact and he had responded to medication in the past. (AR 279.) Dr. Biala noted that Plaintiff was "now back on meds with some mild improvement, but Depakote [was] to be increased." (AR 279.) Dr. Biala opined that Plaintiff could be projected to be able to complete simple, repetitive

tasks by June 2009. (AR 279.) The Commissioner argues this opinion is consistent with the record as a whole because, while Plaintiff complained of psychological symptoms and sought treatment "on a few occasions, he routinely missed counse[]ling appointments and was largely non-compliant with his medication." (Doc. 21, 7:13-16.) The Commissioner contends that the record establishes that "when Plaintiff was compliant with his medications, he functioned well, and had no limitations greater than those Dr. Biala assessed." (Doc. 21, 7:23-24.) The Commissioner notes that Plaintiff was reported to be poorly compliant with keeping appointments and taking prescribed medication in January 2007. (AR 246.) In June 2008, Plaintiff reported that he had been off his medication for three months. (AR 251.) Plaintiff was hospitalized in September 2008, and he was referred for mental health follow-up treatment, but the "ALJ noted that there was no evidence in the record suggesting that Plaintiff followed through with this treatment." (Doc. 21, 8:24-25.)

In crediting Dr. Biala's opinion, however, the ALJ overlooked subsequent significant and probative evidence. The ALJ found that Plaintiff's "recent medical health records [were] consistent with very spar[s]e and intermittent treatment and continued non-compliance." (AR 20.) The ALJ noted that after Plaintiff's October 2008 hospitalization at Marie Green, Plaintiff was instructed to follow-up with regular treatment, but there was no "evidence that the claimant sought such regular treatment." (AR 20.) The ALJ also found that Plaintiff had a well-documented history of non-compliance with medication (AR 246, 251) citing the June 2009 negative drug screen results (AR 378, 382), Plaintiff's statements that his wife was pressuring him to stop his medication (AR 348), and that he stopped taking his Abilify medication on his own without medical advice (AR 336). (AR 20.)

However, treatment records from Merced Mental Health show that Plaintiff not only received monthly medical treatment for his bipolar from October 2008 through 2010, he was noted by Drs. Castillo and Benton to be medication compliant at each examination between October 2008 and April 2010, yet he continued to experience auditory hallucinations. Further, he was hospitalized on subsequent occasions in 2009 and 2010 due to psychiatric issues. Specifically, Plaintiff received treatment at Merced Mental Health on October 1, 2008 (AR 306), October 22, 2008 (AR 307), November 19, 2008 (AR 308), January 12, 2009 (Doc. 352), February 5, 2009 (AR 351), March 30,

2009 (AR 350), April 15, 2009 (AR 349), April 29, 2009 (AR 348), May 13, 2009 (AR 347), May 26, 2009 (counseling session) (AR 346), June 10, 2009 (AR 343), July 31, 2009 (AR 338), August 28, 2009 (AR 337), September 11, 2009 (AR 336), September 25, 2009 (AR 335), November 6, 2009 (AR 333), January 8, 2010 (AR 332), February 24, 2010 (AR 329), and April 23, 2010 (AR 328).  Plaintiff was hospitalized for psychiatric care at Marie Green on May 6, 2009, and Dr. Castillo noted that Plaintiff "has been consistent with his medications but unfortunately his hallucinations continue to persist, especially this past 3-5 days." (AR 323.)  These records suggest that despite regular treatment and reported medication compliance, Plaintiff continued to suffer from auditory hallucinations, was hospitalized for psychiatric care in May 2009, and received emergency medical care related to auditory hallucinations in March 2010.

Moreover, these post-October 2008 treatment records the ALJ overlooked reflect a conflict in the evidence that requires resolution – i.e., whether Plaintiff was medication compliant.  As articulated by the Commissioner, Dr. Biala opined that Plaintiff was capable of simple, repetitive tasks so long as he remained medication compliant.  As discussed above, the 2008 to 2010 Merced Mental Health records show psychiatric hospitalization despite that Plaintiff was noted to be medication compliant.  Nonetheless, Plaintiff's drug screen taken at the emergency room in June 2009 was negative, even for benzodiazepines (AR 378, 382), despite that Plaintiff had reportedly taken such medication earlier in the day.  Moreover, Plaintiff was noted by Merced Mental Health records to be non-compliant with his medication between February 2006 and January 2007 (AR 246) and again in June 2008 (AR 257).  There is also evidence that Plaintiff's wife pressured him to discontinue his medication (AR 348), and that he had stopped taking some of his medication due to perceived side effects (AR 336-38).  The ALJ must address this conflict.  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (the ALJ is responsible for resolving ambiguities and conflicts in the medical evidence).

In sum, the ALJ did not consider all the relevant evidence in making findings with respect to Plaintiff's RFC.  The Merced Mental Health records from October 2008 to April 2010 are inconsistent with the ALJ's finding that Plaintiff exhibited a well-documented lack of treatment and that he did not seek treatment following his hospitalization in September 2008.  The ALJ's adoption

18

of Dr. Biala's opinion was predicated on its consistency with the record as a whole, but the ALJ failed to consider a large and relevant portion of the medical records.  The ALJ must consider all significant and probative medical evidence – it cannot be rejected without comment.  *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam).  How the ALJ weighs the October 2008 through April 2010 Merced Mental Health records and Plaintiff's medication compliance noted in these records is a matter completely within the ALJ's province, but the evidence must be considered.   Under these circumstances, the Court cannot conclude that Dr. Biala's opinion is necessarily supported by the other evidence in the record and is consistent with it.

### 3. Duty to Recontact Treating Sources or Obtain New Medical Evidence

Plaintiff contends that the ALJ should have utilized the services of a medical expert pursuant to Social Security Ruling ("SSR") 96-6p.  (Doc. 18, 5-11.)  Administrative law judges may ask for and consider opinions from medical experts on the nature and severity of an impairment. 20 C.F.R. § 404.1527(2)(iii).  There are two instances where the opinion of a medical expert is required:  (1) when equivalence to a listing is at issue at the Third Step; and (2) when the record is ambiguous regarding the date of onset of the disability.  *See* SSR 96-6p,[5] SSR 83-20 ("At the hearing, the [ALJ] should call on the services of a medical advisor when onset [of disability] must be inferred.");  *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998).  Here, Plaintiff makes no argument that there is an issue as to medical equivalency for purposes of a Listing at the Third Step or about the date of the onset of the disability.  Therefore, Plaintiff's argument that the ALJ had a duty to obtain an expert opinion pursuant to SSR 96-6p is not persuasive.

Plaintiff also contends that the ALJ's duty to fully and fairly develop to the record required the ALJ to obtain further medical evidence.  The ALJ has the duty "to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The ALJ may attempt to obtain additional evidence when the evidence

---

[5] SSR 96-6p states that the ALJ or the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:  (1) when no additional medical evidence is received, but the symptoms, signs, and laboratory findings suggest that a judgment of equivalence may be reasonable; or (2) when additional medical evidence is received that may change the State agency medical or psychological consultant's finding that the impairment is not equivalent in severity to any impairment in the Listing of Impairments.  *SSR* 96-6p, 1996 WL 374180, at * 4 (July 2, 1996).

1   as a whole is insufficient to make a disability determination, or if after weighing the evidence the

2   ALJ cannot make a disability determination.   20 C.F.R. § 404.1527(c)(3); *see also* 20 C.F.R.

3   § 404.1519a.  Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow

4   for proper evaluation of the evidence, triggers the ALJ's duty to "conduct an appropriate inquiry."

5   *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).  The ALJ may discharge this duty in several

6   ways, including:  subpoenaing the claimant's physicians, submitting questions to the claimant's

7   physicians, continuing the hearing, or keeping the record open after the hearing to allow

8   supplementation of the record.  *Tonapetyan*, 242 F.3d at 1150.

9         As the ALJ has not yet weighed all the significant and probative medical evidence or resolved

10  all of the conflicts in the medical record, Plaintiff's argument that the ALJ had a duty to recontact

11  a treating physician or obtain further medical evidence is premature.  To the extent that the ALJ

12  considers all the evidence, there may be no need for any additional medical evidence.  Although Dr.

13  Biala's opinion was obtained prior to Plaintiff's 2009 and 2010 treatment and hospitalizations, this

14  does not mean the opinion is necessarily "stale" to the extent the ALJ's interpretation of the

15  subsequent medical treatment between October 2008 and April 2010 comports with Dr. Biala's

16  opinion. On the other hand, if the ALJ determines that the record is insufficient after reviewing these

17  treatment records, a consultative examination or a consultative expert's review of the records may

18  be appropriate.

19  **B.     Plaintiff's Credibility**

20        The ALJ rejected Plaintiff's credibility in part because he was not compliant with his

21  medication.  (AR 21 ("if claimant's symptoms were as bad as he alleges, then it is reason[able] to

22  expect that he would be more compliant with his medication, which the evidence shows adequately

23  controls his symptoms.").  The ALJ also rejected Plaintiff's credibility based on his lack of regular

24  treatment.   (AR 21 ("it is reasonable to expect that the claimant would attend scheduled

25  appointments and seek regular therapy and psychiatric attention if his symptoms were as bad as he

26  testifies").)  As there is evidence related to Plaintiff's medication compliance and treatment records

27  that the ALJ failed to consider in assessing the medical evidence, the issue of Plaintiff's credibility

28  is inextricably intertwined with the ALJ's assessment of the medical evidence.  As this case will be

1  remanded so the ALJ can consider the medical evidence that was overlooked, the ALJ will need to

2  revisit the issue of Plaintiff's credibility.

3  **C.    Remand is Warranted**

4        "The court shall have power to enter, upon the pleadings and transcript of the record, a

5  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

6  with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In Social Security cases,

7  the decision to remand to the Commissioner for further proceedings or simply to award benefits is

8  within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If

9  additional proceedings can remedy defects in the original administrative proceedings, a social

10 security case should be remanded.  Where, however, a rehearing would simply delay receipt of

11 benefits, reversal [and an award of benefits] is appropriate."  *Id.* (alteration in original) (internal

12 quotation marks omitted).

13        The Court has concluded that the ALJ erred by rejecting significant and probative evidence

14 without comment that facially conflicted with the opinion of Dr. Biala and the ALJ's findings.  In

15 these circumstances, it is appropriate to remand this matter for further administrative proceedings.

16 "Remand for further administrative proceedings is appropriate if enhancement of the record would

17 be useful."  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); *see also Harman v. Apfel*,

18 211 F.3d 1172, 1178 (9th Cir. 2000).  Where there are outstanding issues that must be resolved

19 before a determination of disability can be made, and it is not clear from the record that the ALJ

20 would be required to find the claimant disabled if all the evidence were properly evaluated, remand

21 is appropriate.  *Cf. Benecke*, 379 F.3d at 593; *Harman*, 211 F.3d at 1178.  Here, remand is

22 appropriate so that the ALJ must properly address the medical evidence and Plaintiff's credibility.

23 *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009).

24                                       **CONCLUSION**

25        After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the

26 record, the Court finds that the ALJ's decision is not supported by substantial evidence and is,

27 therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with

28

this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff JEFFREY

GOLDEN, and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.


IT IS SO ORDERED.

**Dated:**   **April 29, 2013**                          **/s/ Sheila K. Oberto**
                                                        UNITED STATES MAGISTRATE JUDGE